IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JERRY CROSBY,<br><br>     Petitioner,<br><br>     vs.<br><br>JOSEPH NOETH, Superintendent, Attica Correctional Facility,<br><br>     Respondent. | No. 9:19-cv-00694-JKS<br><br>MEMORANDUM DECISION |

  Jerry Crosby, a New York state prisoner represented by counsel, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Crosby is in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and incarcerated at Attica Correctional Facility. Respondent has answered the Petition, and Crosby has replied.

I. BACKGROUND/PRIOR PROCEEDINGS

  On August 30, 2013, Crosby was charged with two counts of first-degree murder, two counts of second-degree murder, first-degree robbery, first-degree burglary, and fifth-degree criminal possession of stolen property in an indictment that alleged that Crosby and unknown accomplices repeatedly stabbed and then strangled Jerry Mack to death in the course of a burglary and robbery. The indictment additionally alleged that Crosby sold Mack's coin collection in the days after the murder.

The trial court held a two-day pre-trial *Huntley*[1] hearing to determine the admissibility of statements Crosby had made to law enforcement. At the hearing, Detective Jeffrey Beauchine testified that he was working on the Mack homicide when Crosby was brought into the police station following a New York DNA Databank and Combined DNA Index System ("CODIS") hit.[2] When Beauchine introduced himself to Crosby at around 5:30pm, Crosby was sitting in a holding cell, but was not in handcuffs. He was subsequently moved to an interview room that had recording capabilities, and the entire interview was recorded. A little after 6:00pm, Beauchine read Crosby *Miranda*[3] warnings. Crosby interrupted to ask "whether he was under arrest." Beauchine replied that, "at this point in time he was not under arrest; we had to speak to him regarding something." When Beauchine referred to Crosby's right to counsel, Crosby stated

---

[1]  *People v. Huntley*, 204 N.E.2d 179 (N.Y. 1965) (a shorthand reference to the hearing held in New York on a challenge to the admissibility of statements made to law enforcement personnel).

[2]  Detectives George Hack and Sean Lynch testified on rebuttal that they were investigating Mack's murder when they received information that Crosby's DNA had been found at the murder scene. Hack and Lynch went to several addresses where they believed Crosby might be found. Another detective informed them that Crosby had taken his then-girlfriend to a local hospital, so Hack and Lynch went to her treatment room at St. Joseph's Hospital, where they saw Crosby. Crosby agreed to Detective Hack's request that he step out of the room to speak with them. Crosby confirmed his identity, and Detective Hack informed him that Crosby's name had come up in one of their investigations. Crosby indicated his belief that the police wanted to speak with him about an altercation Crosby had with his brother-in-law. Crosby agreed to accompany the detectives to the police station, where he rode, uncuffed, in the backseat of their police car. Detectives Hack and Lynch testified that they engaged in small talk but did not discuss any investigation during that car ride. According to the detectives, when they arrived at the station, they eventually led Crosby to an interview room, where they left him alone.

[3]  *Miranda v. Arizona*, 384 U.S. 436, 479 (1966) (requiring police to give suspects subject to interrogation in police custody information regarding their constitutional rights).

that "my lawyer, my momma, my brothers and sisters, everybody, they're gonna be here real soon."  In response, Beauchine said, "Let me finish first, then we'll talk after that."

Beauchine testified that he did not interpret Crosby's statement as the invocation of his right to counsel, and he continued reading the *Miranda* warnings.  After Beauchine finished the warnings, Beauchine denied knowing Mack, visiting his home, or having any responsibility for his death.  After he twice was shown two photographs of the crime scene showing his blood on a table and on the broken table leg, Crosby continued to deny his involvement.  Approximately 50 minutes into the interview, Crosby stood up and said, "Take me to jail now."  After he began speaking again, the detectives questioned Crosby for several more hours until, around 11:30pm, Crosby announced that he was invoking his Fifth Amendment privilege, and the questioning ceased.  None of Crosby's family members or any attorney appeared or contacted law enforcement on Crosby's behalf.

Crosby also testified at the *Huntley* hearing.  He claimed that he offered to meet Detectives Hack and Lynch at the station, but was told that "would not be the case," and he felt forced to go with them to the station.  Crosby said that, during the ride to the police station, he told the police that his brother-in-law had chased him with a hammer, and he did not understand why he needed to go to the station to discuss that incident.  According to Crosby, he told the detectives, "I think I [am] going to get a lawyer," but he was told he "wouldn't need one, just talk with them and it's going to be brief, nothing serious."  Crosby also testified that, while he was waiting in the interview room and before recording began, Hack and Lynch re-entered, and Crosby mentioned a lawyer on another case with his sister.  They asked who his lawyer was, and Crosby said he did not know.  The detectives told him, "don't worry about it," and they would

"find out who the guy is" and "contact [his] lawyer." Crosby further testified that his statement during the recorded portion of the interview that his family was coming with his lawyer was based on Detectives Hack and Lynch telling him that they would call his lawyer. On cross-examination, Crosby replied "yes" when asked whether he "agree[d] to speak with [the detectives]" after he was given his *Miranda* warnings, and confirmed that he did not "ever stop the detectives during the interview and ask them, is my lawyer here?"

After reviewing the recording of the interview, the county court denied suppression of Crosby's statements. The court did not credit Crosby's testimony that he told the detectives during transport to the police station that "he might need a lawyer," and that, even if such a statement were made, it "did not constitute an unequivocal request for counsel." The hearing court found that Crosby agreed to accompany police to the station, that he did not receive *Miranda* warnings at that time, and he did not ask for an attorney at any time in their presence, either during transport or in the interview room. The court further concluded that, after Detective Beauchine administered *Miranda* warnings, Crosby voluntarily agreed to talk to police without an attorney present, and did not unequivocally invoke his right to remain silent until just before the interview was ended.

Crosby then proceeded to a jury trial, at which 109 marked exhibits were admitted as evidence, and eighteen witnesses testified during the People's case. Crosby testified on his own behalf. According to Crosby, on the night of the murder, he cut his hand during a fight with his cousin over an outstanding drug debt. After the fight, his cousin offered to repay the debt with drugs, and drove Crosby to Mack's home to obtain them. While Crosby waited in the living room, his cousin went into another room to get the drugs. During that time, Crosby's hand was

still bleeding from the earlier fight, and the blood dripped on the table and floor. Crosby admitted that he later sold Mack's coin collection, but testified that he had received the coins from his cousin a month prior to the murder. Crosby said that his cousin had died a month or two before trial.

At the conclusion of trial, the jury acquitted Crosby of the first-degree murder counts, but convicted him of two counts of second-degree murder, first-degree robbery, first-degree burglary, and fifth-degree criminal possession of stolen property. After Crosby admitted that he had a predicate conviction for second-degree assault, the court sentenced him to an aggregate term of 25 years to life imprisonment.

Through counsel, Crosby appealed his conviction, arguing, as relevant here, that county court erred in declining to suppress his statements to police because he unequivocally invoked his Fifth Amendment right to counsel. The Appellate Division of the New York Supreme Court unanimously affirmed the judgment of conviction in a reasoned opinion issued on February 9, 2018. *People v. Crosby*, 70 N.Y.S.3d 718, 720 (N.Y. App. Div. 2018). In rejecting Crosby's *Miranda* violation claim, the Appellate Division held that Crosby "did not 'adequately apprise[] the police that he had retained an attorney with respect to the matter under investigation and that he wished his attorney to be present during questioning.'" *Id.* at 719-20. Crosby applied for leave to appeal, which the New York Court of Appeals denied without comment on June 12, 2018. *People v. Crosby*, 106 N.E.3d 758, 758 (N.Y. 2018).

Crosby then timely filed the instant counseled Petition for a Writ of Habeas Corpus to this Court on June 11, 2019. Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1)(A).

II. GROUNDS RAISED

In his counseled Petition before this Court, Crosby argues that the New York courts unreasonably applied clearly-established authority of the U.S. Supreme Court in holding that his *Miranda* rights were not violated because Crosby did not unequivocally invoke his constitutional right to counsel.

### III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000). The term unreasonable is a common term in the legal world. The Supreme Court has cautioned, however, that the range of reasonable judgments may depend in part on the nature of the relevant rule argued to be clearly established federal law. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S.

Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Jones v. Stinson*, 229 F.3d 112, 118 (2d Cir. 2000). Where there is no reasoned decision of the state court addressing the ground or grounds raised on the merits and no independent state grounds exist for not addressing those grounds, this Court must decide the issues de novo on the record before it. *See Dolphy v. Mantello*, 552 F.3d 236, 239-40 (2d Cir. 2009) (citing *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)); *cf. Wiggins v. Smith*, 539 U.S. 510, 530-31 (2003) (applying a de novo standard to a federal claim not reached by the state court). In so doing, the Court presumes that the state court decided the claim on the merits and the decision rested on federal grounds. *See Coleman v. Thompson*, 501 U.S. 722, 740 (1991); *Harris v. Reed*, 489 U.S. 255, 263 (1989); *see also Jimenez v. Walker*, 458 F.3d 130, 140 (2d Cir. 2006) (explaining the *Harris-Coleman* interplay); *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 810-11 (2d Cir. 2000) (same). This Court gives the presumed decision of the state court the same AEDPA deference that it would give a reasoned decision of the state court. *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011) (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference);

*Jimenez*, 458 F.3d at 145-46.  Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

Prior to interrogating a suspect, a law enforcement official must advise the accused that she has the right to consult with an attorney; if she requests an attorney in response to such, the interrogation must cease until an attorney is provided.  *Miranda v. Arizona*, 384 U.S. 436, 471, 474 (1966).  After an accused has invoked her right to counsel, law enforcement officials must cease their interrogation until counsel has been provided, unless the accused personally initiates further communication with law enforcement.  *Edwards v. Arizona*, 451 U.S. 477, 484-485 (1981).  Invocation of the right to counsel must be unambiguous and unequivocal to require law enforcement officials to cease their interrogation.  *Diaz v. Senkowski*, 76 F.3d 61, 64 (2d Cir. 1996).  Even if the accused's request for counsel could be considered as ambiguous by an ordinary person, such request must be given a broad interpretation when determining whether the accused was in fact requesting an attorney.  *Connecticut v. Barrett*, 479 U.S. 523, 529 (1987).  An objective test is used to determine whether an accused has requested the assistance of counsel; the underlying, unexpressed intent of the accused is not relevant.  *Diaz*, 76 F.3d at 64.

The Appellate Division considered and rejected Crosby's *Miranda* violation claim on direct appeal as follows:

> Contrary to [Crosby's] contention, County Court did not err in refusing to suppress his statements to the police.  The evidence at the suppression hearing established that, when a police detective was administering the *Miranda* warnings, [Crosby] said that his lawyer, mother, brother, and sister were on their way to the police station.  The detective finished administering the warnings and, without hesitation, [Crosby] said that he understood the warnings and agreed to waive his rights and to speak

8

> with the police. We agree with the court that [Crosby's] statement was not an unequivocal request for the assistance of counsel and thus, contrary to [Crosby's] contention, the right to counsel did not attach.

*Crosby*, 70 N.Y.S.3d at 719.

The record amply supports that the state appellate court properly considered the totality of the circumstances in determining whether Crosby understood and voluntarily waived his *Miranda* rights. That conclusion was not an unreasonable determination of the facts in light of the record.

In the instant Petition, Crosby nonetheless challenges the Appellate Division's holding, arguing that it "unreasonably applied the Supreme Court's holding in *Davis v. United States*, and on *de novo* review this Court should grant Mr. Crosby's claim under *Smith v. Illinois*." In *Davis*, the Supreme Court held that the accused need not be eloquent in her request for counsel, so long as the request is clear enough that "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994). Here, however, Crosby fails to show that a reasonable attorney would interpret Crosby's statement that an attorney was on the way as a request for an attorney, particularly given that it was a statement, and not in the form of a request. The Supreme Court did state in *Davis* that "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants" to invoke the privilege. *Davis*, 512 U.S. at 461. Indeed, clarifying questions "minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement." *Id.* However, the Supreme Court expressly "decline[d] to adopt a rule requiring officers to ask clarifying questions." *Id*. at 461. Rather, "[i]f the suspect's

statement is not an [] unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning." *Id.* at 461-62.

Given that such clarification is not strictly required under U.S. Supreme Court authority, this Court cannot find that the state court's determination was contrary to *Davis*.[4]  *See Salinas v. Texas*, 570 U.S. 178, 186 (2013) ("We have before us no allegation that petitioner's failure to assert the privilege was involuntary, and it would have been a simple matter for him to say that he was not answering the officer's question on Fifth Amendment grounds."); *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011).  The Supreme Court has further held that, in determining whether the accused's statement is a request for counsel, "a statement is either such an assertion of the right to counsel or it is not." *Smith v. Illinois*, 469 U.S. 91, 97-98 (1984).  Because the Appellate Division's determination that Crosby's statement was not an unequivocal request for counsel is neither unreasonable nor contrary to *Davis* or *Smith,* Crosby is not entitled to federal habeas relief.

---

[4]  Crosby argues that this Court should apply *de novo* review in adjudicating his *Miranda* claim.  Whether a criminal defendant unequivocally invoked his right to counsel is a mixed question of law and fact—what the defendant said and the circumstances under which he said it are questions of fact, and whether the words that were said constituted an unequivocal request for counsel under the circumstances is a question of law.  *See, e.g.*, *United States v. Oba*, 978 F.2d 1123, 1129 (9th Cir.1992) (holding that Court would review de novo whether the words used by the defendant constituted a request for counsel).  Nonetheless, a federal court reviewing a mixed question of law and fact in a § 2254 habeas petition may grant the petition only if "the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Ramirez v. Senkowski*, 7 F. Supp. 2d 180, 191 (E.D.N.Y.1998) (finding that "a Federal habeas court faced with a mixed question of law and fact decided by the State court should decline to issue the writ unless the State trial and appellate courts have unreasonably applied constitutional principles clearly established by the Supreme Court").

V. CONCLUSION

Crosby is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.  *See* FED. R. APP. P. 22(b); 2D CIR. R. 22.1.

The Clerk of the Court is to enter judgment accordingly.

Dated: April 6, 2021.

                                               /s/ James K. Singleton, Jr.
                                               JAMES K. SINGLETON, JR.
                                               Senior United States District Judge